UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

| | |
|---|---|
| MICAL BUCHOLZ,<br>LUKE MOEN, and<br>BENJAMIN LIEFFORT;<br><br>    Plaintiffs,<br><br>vs.<br><br>ARTISAN AND TRUCKERS<br>CASUALTY COMPANY,<br><br>    Defendant. | CV 20-5011<br><br><br><br><br>**COMPLAINT AND DEMAND**<br>    **FOR JURY TRIAL** |

COMES NOW the Plaintiffs, by and through their attorneys, and for their causes of action, state and allege:

## NATURE OF THE CLAIM

This claim arises from the Defendant's attempt to defraud/deceive Plaintiffs into settling their negligence action against its insured for less than full value.

On October 16, 2015, in rural Roberts County, South Dakota, a Pontiac Aztec driven by Sharon Cavanagh was abandoned in the inside southbound passing lane of Interstate 29 after it struck a deer. Cavanagh told a highway patrol accident investigator the vehicle was left on the roadway because the collision with the deer caused the car's engine to stop running and all its lights to go dim before she was able to steer it off the road. Cavanagh's vehicle was insured by Artisan Truckers Casualty Company ("Artisan").

A short time after Cavanagh abandoned her unlit vehicle, a car driven by Benjamin Lieffort, which was also occupied by Luke Moen and Mical Bucholz, was approaching

1

Cavanagh's abandoned and non-illuminated Aztec at 75 miles per hour. Lieffort was unable to discern that the Aztec was in his path in time to avoid a collision.

In the days following the accident, Artisan ended up with possession of the Aztec. It authorized one of its employees/agents to inspect the car to see if it could determine the reason Cavanagh's vehicle motor quit running and it lost all its lights following the collision with the deer. The investigation showed that the vehicle could hold an electrical charge which made it possible to illuminate various interior and exterior lights on the vehicle.

Rather than share this information with Bucholz, Lieffort and Moen, Artisan instead chose to claim that Lieffort was negligent more than slight in comparison to Cavanagh in order to attempt to lower the value of the three claims. Artisan also informed counsel for Bucholz, Moen and Lieffort the most anyone could recover under Cavanagh's policy with Artisan was $50,000.00, even though Artisan later represented that Cavanagh's liability policy had $100K/$300K coverage.

When counsel for Bucholz, Lieffort and Moen was finally allowed the opportunity to inspect the Aztec, they learned the truth about the vehicle's lighting system. After unreasonably delaying the offer of policy limits on each claim for many months, Artisan finally offered each Plaintiff a $100,000.00 "policy limits" settlement.

Plaintiffs bring this diversity suit against Artisan to determine the amount of coverage Cavanagh's liability insurance policy *actually* had available and to recover general, special and punitive damages based upon their claims. They also seek statutory attorney's fees.

## PARTIES AND VENUE

1. Plaintiffs, Mical Bucholz, Luke Moen, and Benjamin Lieffort, are each residents and citizens of the State of South Dakota.

2. Artisan and Truckers Casualty Company (Artisan), Defendant, is a Wisconsin corporation with its principal place of business in Cleveland, Ohio. It is not a citizen of the State of South Dakota.

3. Artisan conducted business in South Dakota by negotiating a personal injury liability claim against one of its insureds without being registered with the South Dakota Secretary of State's Office.

## JURISDICTION AND VENUE

4. Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 based upon diversity of the parties. The amount in controversy exceeds $75,000.00.

5. A substantial part of the events giving rise to this action occurred in South Dakota. Venue is proper in this Court pursuant to 28 U.S.C. § 1891(b)(2).

## GENERAL ALLEGATIONS

6. On October 16, 2015, Mical Bucholz, Ben Lieffort (Mical's boyfriend) and Luke Moen, a mutual friend, were on their way back from North Dakota in Mical's vehicle traveling south near Sisseton, South Dakota on I-29 about midnight.

7. Lieffort was driving approximately 75 miles per hour in an 80 mph zone.

8. The roadway surface was clear.

9. At around the same time, several miles to the north, a Pontiac Aztec was being driven southbound by Sharon Cavanagh on this same stretch of road.

10. Shortly before midnight, a deer ran across the roadway in front of Cavanagh who collided with the deer.

11. The force of the collision catapulted the deer carcass over the top of the Aztec, causing damage to the vehicle's frontend and hood, and windshield.

12. Once the vehicle stopped, Cavanagh exited through the driver's side door and made her way to the ditch located on the west side of the southbound passing lane where she used her cell phone to report her accident to law enforcement. Cavanagh waited in the ditch for law enforcement to arrive.

13. Around midnight, several minutes after Cavanagh reported her accident to law enforcement, Lieffort came upon Cavanagh's stranded Aztec in the inside lane of the Interstate.

14. Even though Cavanagh's vehicle was stopped in the inside *driving* lane of the Interstate with none of the vehicle's interior or exterior lights illuminated or flashers activated, Cavanagh took no steps to warn oncoming vehicles of this dangerous situation.

15. Unfortunately, Lieffort was unable to see the stranded vehicle in time to take evasive action to avoid a collision, and struck Cavanagh's Aztec at high speed.

16. Upon impact, the Pontiac in which Bucholz, Moen and Lieffort were traveling, pushed Cavanagh's Aztec into the median of the Interstate.

17. Bucholz, Moen and Lieffort were all badly injured as a result of the collision.

18. Cavanagh later told an accident investigator from the South Dakota Highway Patrol that

when her vehicle struck the deer, her engine quit running and her car lost all electrical power, including power to her headlights, taillights, and the electrical components located within the vehicle compartment.

19. Cavanagh left the accident investigator with the impression that due to the disabled condition of her Aztec, she was unable to get it off the roadway.

20. Bucholz's car was insured by Progressive Northern Insurance Company ("Progressive Northern") and the abandoned Aztec was insured by Artisan.

21. Both Progressive Northern and Artisan are wholly owned subsidiaries under the Progressive Group of Insurance Companies.

22. Several days after the accident, Bucholz, Moen and Lieffort hired Attorney Brian Radke, from the Radke Law Office, to pursue a personal injury claim against Cavanagh.

23. Radke Law Office contacted Artisan to open a claim against Cavanagh's policy.

24. Progressive-trained adjuster, Tara Kennedy, was the initial adjuster assigned to handle the claim. Radke put Kennedy on notice that he wanted the opportunity to have Cavanagh's vehicle inspected and that it should not be altered or released from its custody prior to that inspection.

25. Kennedy readily agreed that the Aztec would not be moved, altered, or disposed of without notifying Radke.

26. Despite the fact that Cavanagh had abandoned the Aztec in the driving lane of I-29 without making any effort to warn other motorists of the vehicle's presence, Kennedy advised Radke that she was looking into whether Lieffort was contributorily negligent more than slight, which would prohibit him from recovering under Cavanagh's policy

based upon South Dakota's contributory negligence law. It would have also meant that any recovery for Moen or Bucholz would have to come from Bucholz's coverage with Progressive Northern. Because Bucholz was a passenger in her own vehicle, her Progressive Northern policy did not allow her to recover if Lieffort was contributorily negligent. As a result, only Moen could recover from Bucholz's policy.

27. Kennedy eventually informed Radke that her investigation was about complete. She asked Radke to have his clients sign medical releases. She also informed Radke that once she had all three sets of medical records, she would likely agree to pay what she claimed was the $50,000.00 limits on each party's claim against Cavanagh's Artisan policy.

28. After several weeks had passed since Radke supplied the medical releases to Kennedy, he inquired whether she was ready to make policy limits offers on all three claims.

29. Radke was then informed that adjuster, Terry Diggins, was taking over the three claims and that any settlement negotiations would have to go through him.

30. The first time Radke spoke with Diggins, he inquired whether Artisan was considering paying policy limits on all three claims based upon Tara Kennedy's previous assertion that this would likely be the case.

31. Diggins informed Radke there had been a change in how the claim was being handled and that he was having the case "round tabled" among his group of Progressive adjusters and managers. He also informed Radke for the first time that instead of 50K limits, there were really limits of 100K for each person in the accident, i.e., 100/300K limits.

32. During this conversation, Diggins seemed to suggest that the new position from Artisan was going to once again be that Lieffort was negligent more than slight.

33. This meant Lieffort would have no claim against Cavanagh's Artisan policy under South Dakota's contributory negligence law.

34. Diggins also told Radke Bucholz would have no liability claim against Lieffort for negligence even though Lieffort was uninsured, because under her Progressive Northern insurance policy, Mical, who was a passenger in her own vehicle, was prohibited, under the terms of her uninsured motorist policy, from making such a claim.

35. Radke informed Diggins that even if that were the case, Luke Moen, who was a passenger, would still have a claim against Lieffort under Bucholz's Progressive Northern policy for up to $100,000.00 plus a claim for medical payments coverage.

36. Radke informed Diggins that he wanted to immediately inspect Cavanagh's vehicle. In the meantime, Diggins agreed to send Radke pictures of the vehicle.

37. After looking at the pictures sent by Diggins, Radke compared them to pictures taken of Cavanagh's vehicle as it looked in the initial lot it was taken to near Sisseton, South Dakota ("Sisseton lot"). Several of the pictures sent by Diggins showed (when compared with the first set of photos) that sometime after the vehicle had left the Sisseton lot, someone had altered various parts of the vehicle by removing lights, removing pieces of foam insulation, taking the telescoping posts off of the hood so it could be tipped up flush with the windshield, etc.

38. When Radke called Diggins about finalizing the details concerning how he was to be given access to the Cavanagh's vehicle, he asked Diggins several times in several different ways, whether someone had altered and/or inspected the Cavanagh vehicle even

though he had specifically asked Tara Kennedy to make sure that no one altered or inspected the vehicle prior to him being allowed to inspect it.

39. Diggins assured Radke no one had altered or manipulated the vehicle. Knowing that there were pictures depicting the condition of the Cavanagh car before it was moved to the warehouse, and that those pictures demonstrated that this statement was false, Radke once again asked Diggins whether he was possibly mistaken, and someone may have altered the vehicle. This prompted Diggins to quickly reply: "Don't even go there. I don't play those kinds of games."

40. Ultimately, Radke was given permission to visit the warehouse where Cavanagh's vehicle was kept.

41. At Diggins' direction, Radke spoke with a woman named "Elise," whom he was told would allow him access to the warehouse to inspect Cavanagh's vehicle.

42. After a brief inspection, while being careful not to disturb any evidence in or around the car, Radke asked permission to have an independent investigator inspect the vehicle, take pictures, and interview whoever Diggins lined up as the custodian of the vehicle.

43. Diggins agreed Radke could return to the warehouse with his investigator.

44. At the warehouse, "Elise" supervised Radke and his investigator as the investigator inspected the Aztec.

45. During the inspection, "Elise" admitted to Radke's investigator that sometime after Cavanagh's vehicle arrived at the warehouse, she unsuccessfully attempted to charge its battery. The investigator thought this statement was interesting given that he was aware

that the insurance adjuster insisted to Radke that the Aztec had not been inspected or altered.

46. The investigator asked "Elise" if the plastic wrap which was enveloping the vehicle could be removed so he could inspect the interior of the vehicle. "Elise" accommodated this request and the plastic wrap was peeled off. This allowed the investigator access to all parts of the car including its exterior, the passenger compartment, and the engine compartment.

47. Once the investigator had the opportunity to peer into the newly illuminated passenger compartment, his attention was drawn to what appeared to be a flashing light on the dashboard. The driver's side door was opened with the permission of "Elise" and the investigator noticed there were keys in the ignition.

48. The investigator asked "Elise" for permission to turn the key to the "on" position. "Elise" agreed. After the key was turned to the "on" position, one of the vehicle's large rear red taillights was illuminated demonstrating that the vehicle had electrical power suggesting that the red taillight was functional after the collision with the deer. This also made Elise's claim that she could not get the Aztec to take a charge, quite suspicious.

49. When Radke showed the pictures of the vehicle provided by Diggins to his investigator prior to going in the warehouse, they noted that one of the pictures depicted someone wearing black fingernail polish was holding up a part which came from the vehicle.

50. On the date of the inspection at the warehouse, Radke and his investigator noticed that "Elise" appeared to be wearing the same black fingernail polish as the person in Diggins's picture.

51. "Elise" was asked if it might have been her who was holding the piece of Cavanagh's vehicle in their hand in one of the pictures sent by Diggins.

52. She agreed this was a possibility, but nevertheless, indicated that to her knowledge no one had altered or inspected the vehicle in any manner since it arrived in Sioux Falls.

53. After the second inspection, Radke confronted Diggins.

54. He informed Diggins that based upon the inspections of the vehicle, it was impossible that Cavanagh's vehicle had not been inspected, altered and taken apart by someone on behalf of Artisan. Diggins denied this was the case and became quite upset at Radke's assertions.

55. A short time after this confrontation, Radke was notified by Robert Hansel that he was the new adjuster on the case.

56. Radke advised Hansel that he felt Diggins had been dishonest about whether anyone had altered, taken apart or inspected the Cavanagh vehicle.

57. When Radke informed Hansel he had received assurances from the first adjuster on the case for Artisan, Tara Kennedy, that the vehicle would not be altered or inspected without notification to Radke, Hansel confessed that Diggins had hired an investigator who had inspected Cavanagh's vehicle. This was the first time Radke had ever heard this.

58. Hansel also asserted that Radke must have failed to communicate to Artisan that he was demanding that a "hold" be placed on the vehicle.

59. When Radke demanded that Hansel provide him with a copy of the report of the investigator hired by Diggins, Hansel back peddled. He told Radke that he was mistaken, and that no investigator had inspected the vehicle.

60. Sometime in the spring of 2016 (eight months after the accident), Hansel informed Radke that Artisan was offering policy limits of $100,000.00 to all three of Radke's clients.

61. Radke informed Hansel that his clients would not agree to sign global releases given that they were reserving their right to assert fraud and/or bad faith against Artisan in a subsequent action.

62. Hansel sent Radke a release he wanted Bucholz, Moen and Lieffort to sign before he would provide each with a check for $100,000.00.

63. The releases provided by Hansel each contained a provision clearly designed to waive the right to sue Artisan in the future for fraud or bad faith.

64. Radke immediately advised Hansel that the releases needed to be changed and provided an amended version of each release which contained a provision that made it clear that Radke's three clients were reserving the right to bring a deceit or bad faith case after settling their underlying claims with Artisan for $100,000.00 each.

65. Hansel told Radke that he would agree to settle the claims without a global settlement of all claims, such as fraud and bad faith. However, when the releases arrived, Radke was astonished to learn that Hansel had reinserted a provision which made them global releases. Radke made it very clear he was unhappy the releases still had not been changed and indicated his clients would not agree to a global release. Hansel responded by informing Radke he had retained attorney, Mark Arndt, to negotiate the releases.

66. After multiple drafts were exchanged between Radke and Arndt, in late 2016, Bucholz, Moen and Lieffort each signed a release reflecting they were settling their respective

claims against Cavanagh for $100,000.00, but expressly reserving their right to bring suit against Artisan for claims including bad faith, fraud/deceit and vexatious denial.

## CAUSES OF ACTION

## COUNT I - DECEIT/FRAUD

67. Plaintiffs incorporate each and every allegation set forth above.

68. Artisan made untrue statements and material omissions about the mechanical condition it knew Cavanaugh's Pontiac Aztec to be in following its collision with a deer, but prior to it being struck by Bucholz's vehicle.

69. Artisan, through its agents and employees, suggested, as a fact, of that which is not true, while not believing it to be true;

70. Artisan, through its agents and employees, asserted, as a fact, of that which is not true, while having no reasonable ground for believing it to be true;

71. Artisan, through its agents and employees, suppressed a fact while bound to disclose it, or gave information of other facts which were likely to mislead for want of communication of that fact.

72. The actions set forth above, constituted the tort of deceit under SDCL 20-10-1 and 20-10-2, paragraphs (1) to (3).

73. Artisan is therefore liable for any damage which Plaintiffs suffered because they altered their positions to their injury or detriment.

74. Such damages to each Plaintiff includes, but is not limited to: (1) unnecessary attorney fees incurred as a result of Artisan's deceitful defense of Plaintiffs' claims; (2) unnecessary costs for retaining experts to refute Artisan's fraudulent coverage position;

(3) interests for the months Artisan fraudulently withheld the proceeds of Plaintiffs' claim; and (4) mental and emotional harm as a result of Artisan's deceitful defense, denial, and the delay which caused unnecessary stress, anxiety, and worry about whether their medical bills would be covered, whether they would be able to continue to receive medical treatment.

75. In addition, Plaintiff Lieffort suffered mental and emotional harm having to live with his guilt over the possibility that the deceitful allegations concerning his contributory negligence made by Artisan would keep Bucholz from getting surgery or repaying her substantial medical bills.

## COUNT II – BAD FAITH (COMMON LAW)

76. Plaintiffs incorporate by reference each and every paragraph set forth herein.
77. Defendant, upon investigation, had a duty to pay for the insured loss.
78. Defendant had a duty to determine a reasonable coverage position, and extent of Plaintiffs' damages.
79. Defendant knew or should have known that there was no basis for Defendant to deny the claims and put forth the defense it attempted to manufacture through its deceit.
80. Defendant attempted to deprive Plaintiffs of their benefits under the Cavanagh insurance contract through fraud and deceit.
81. Defendant has breached the implied covenant of good faith and fair dealings under the insurance contract.

## COUNT III - UNFAIR TRADE PRACTICES (STATUTORY BAD FAITH)

82. Plaintiffs incorporate each and every allegation set forth above.

83. Defendant's actions, described above, constitute unfair or deceptive acts or practices in the business of insurance, under SDCL 58-33-67.

84. As a result of Defendant's unfair or deceptive acts in the business of insurance, Plaintiffs had to live for several months under the belief that Defendant was not going to cover their damages and that they were either going to have to go without medical procedures, including surgery, their doctors had prescribed or face the prospect of filing for bankruptcy or owing a financially crippling debt to their medical care providers for years to come.

85. As a further result of Defendant's unfair or deceptive acts in the business of insurance, Plaintiffs were forced to incur unnecessary costs in the investigation and resolution of the insurance claims, including additional costs and expenses, including attorneys' fees and expert witness fees.

86. Pursuant to SDCL 58-33-46.1, Plaintiffs are entitled to recover civil damages for the actual and consequential damages suffered as a result of such unfair trade practices including:

    1) interest on the individual claims which Artisan ultimately paid for the period of time said benefits were unreasonably withheld,

    2) damages for mental and emotional suffering, *see* SDCL 21-2-2;

    3) costs incurred by Plaintiffs, including expert witness fees and other costs, required to expose Artisan's unfair trade practices,

    4) reasonable attorneys' fees to be determined by the Court; and

  5)  any other actual or consequential damages stemming from Artisan's unfair trade practices/statutory bad faith.

## COUNT IV - Punitive Damages

87. Plaintiffs incorporate each and every allegation set forth above.

88. Defendant is guilty of oppression, fraud, actual malice and/or presumed malice.

89. Defendant acted intentionally or with willful and wanton misconduct, and in disregard for the rights of Plaintiffs.

90. Plaintiffs are entitled to punitive damages to punish Defendant and for the sake of example.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for the following relief:

  1. For a judgment against Artisan on their count for Deceit/Fraud;

  2. For a judgment against Artisan on their count for Bad Faith;

  3. For a judgment on their count for Unfair Trade Practices;

  4. For Plaintiffs' compensatory, general, punitive and special damages, including mental and emotional pain and suffering and loss of enjoyment of life in an amount in excess of $75,000.00 that the jury deems just and proper under the circumstances;

  5. For interest on the $100,000.00 claims paid by Artisan for the period of time in which these benefits were unreasonably withheld;

  5. For Plaintiffs' costs and disbursements herein;

  6. For pre-judgment and post-judgment interest;

7. For unnecessary attorney fees caused by Defendant's unreasonable delay in paying Plaintiffs their policy limits settlements, and

8. For such other and further relief as the Court determines to be just and proper, including attorneys' fees and/or costs in this matter.

Dated this 7th day of February, 2020.

                    GOODSELL QUINN, LLP

                By: /s/ David Barari
                    G. Verne Goodsell
                    David Barari
                    Nathan R. Oviatt
                    246 Founders Park Dr., Suite 201
                    P.O. Box 9249
                    Rapid City, SD 57709-9249
                    Tel: (605) 343-3000
                    Fax: (605) 343-3251
                    verne@goodsellquinn.com
                    nate@goodsellquinn.com
                    david@goodsellquinn.com

                    *ATTORNEYS FOR PLAINTIFFS*

PLAINTIFFS REQUEST TRIAL BY JURY

                By: /s/ David Barari
                    David Barari

JS 44 (Rev. 09/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
MICAL BUCHOLZ, LUKE MOEN and BENJAMIN LIEFFORT

**(b)** County of Residence of First Listed Plaintiff   LAWRENCE COUNTY, SD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
G. Verne Goodsell, David Barari, Nathan Oviatt; Goodsell Quinn, LLP, 246 Founders Park Dr., Suite 201, Rapid City, SD 57701, 605-343-3000

## DEFENDANTS
ARTISAN AND TRUCKERS CASUALTY COMPANY

County of Residence of First Listed Defendant   DANE COUNTY, WI
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | | **SOCIAL SECURITY** | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| | | | | ☐ 864 SSID Title XVI | |
| | | | | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty **Other:** | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332
Brief description of cause:
Deceit/Fraud, Bad Faith, Punitive Damages, Unfair Trade Practices

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE: 02/07/2020
SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____